## DAY, etc. v BERTOMEU, et al. and GIBBONS, SMITH, COHN & ARNETT, P.A. v DAY, etc.

Case No. 85-6815 (Consolidated with Case No. 89-6991)

Thirteenth Judicial Circuit, Hillsborough County

September 15, 1989

**APPEARANCES OF COUNSEL**

**Harry M. Hobbs,** for petitioners.

### OPINION OF THE COURT

JOHN G. HODGES, Circuit Judge (Retired)

*ORDER ON PETITION TO DETERMINE AMOUNT OF ATTORNEYS' LIEN*

This cause came on to be heard on the petition of Gibbons, Tucker, Miller, Whatley, and Stein, P.A., to determine the amount of its lien for attorneys' fees and the court having first found that the petitioning law firm was prematurely discharged without cause by the plaintiffs, and having carefully considered the evidence adduced, consisting of all matters of record, including timesheets and billing drafts, testimony of witnesses and the oral and written argument and briefs of able counsel,

and being fully advised, makes the following findings bearing upon what it believes to be the proper basis, under existing Florida law, for computing a reasonable fee for the services performed for the plaintiffs by the petitioners before their dismissal;

The factual skein of this internecene fee dispute between attorneys began to be woven in October, 1984, when Cynthia Ann Day, as personal co-representative, with her sister, Angela Mary Day, of the estates of their parents, Lloyd R. Day and Pauline F. Day, deceased, contacted D. Wade Wetherington, Esquire, for the purpose of retaining the law firm with which he was then associated, Gibbons, Tucker, Miller, Whatley, and Stein, P.A., to represent the estates in any claim they might have arising out of the deaths by fire of the parents in their home in Tampa on September 12, 1984. Gibbons, Tucker, Miller, Whatley and Stein, P.A. and Gibbons, Smith, Cohn and Arnett, P.A. were organized as a result of the separation, in earlier 1984, of a former professional association with which some attorneys for each of the present law firms were associated. As a result of her discussion with Mr. Wetherington, Cynthia Ann Day entered into an attorney client agreement with Gibbons, Tucker, and agreed to pay to them the following attorney's fee:

"(25%) if the case is settled prior to trial;

(33%) after commencement of trial."

At the time of Mr. Wetherington's interview with the client, a Florida State Fire Marshall and an independent fire cause and origin expert had determined that the fire which destroyed the home and lives of the elder Days had originated in the television set or, more likely, in the cable converter located in the den of the Day's home. It was further determined that the fire began sometime in the early hours of the morning when the Days were asleep after they had consumed alcoholic drinks. The case presented several theories of liability against those responsible for the manufacture and assembly of the electronic components involved, including strict product liability and negligence. The fact that the Days had been drinking on the night of the fatal experience would not obviate their rights of actions although it might, of course, mitigate damages. Moreover, the question of punitive damages was considered but not determinative in assessing the likelihood of successful litigation which appeared to be fairly good at the time, although this assessment was based upon an erroneous emphasis upon the converter, which later appeared to be faultless, and upon another component, a capacitor, on which hopes for punitive damages had been hinged, which was found much later, in expert depositions taken the

**173**

week of March 7, 1988, to have been replaced in the television set before the tragedy.

Mr. Wetherington had been practicing law for only three and one half years and had not been involved in wrongful death or product liability cases. However, he was designated as the lead counsel for the firm in this particular litigation and at all times had control of it.

Pursuant to the attorney client contract, Mr. Wetherington, acting for the firm, in early 1985, filed a law suit against those parties he thought to be legally responsible for the destruction of the home and the fiery deaths of the parents, naming as defendants GROUP W. CABLE, INC., WESTINGHOUSE BROADCASTING AND CABLE, INC., GTE COMMUNICATION SYSTEMS CORPORATION, NICHOLAS COMMUNICATIONS, INC., and VINCENT E. BERTEOMEU, a technician who had worked on the television set and who, as yet, has not been dismissed from the case.

In November, 1985, Mr. Wetherington and Mr. Tucker of the Gibbons, Tucker law firm approached Harry Hobbs, Esquire, an experienced and highly competent Tampa trial attorney, to evaluate the case. Mr. Hobbs stated to them that Mr. Wetherington "would settle the case for $400,000."

No action in the case had been taken by Mr. Wetherington without extensive in-depth research, and discovery initially indicated that the converter had been designed in an unsafe manner or had been responsible for starting the fire. However, the statute of limitations was running on any action against ZENITH, so that defendant was joined in the litigation in 1986, but was not served with process for some three or four months.

Thereafter, investigation focused on the television set, as opposed to the converter and created the basis for ultimate success in the litigation.

Vigorous discovery against ZENITH was pursued but Mr. Wetherington had not retained an economist to advise him on damages until August 26, 1985, nor did he retain a psychiatrist to evaluate the effect of the parents' death on the minor daughters until April, 1987.

Trial was scheduled to commence on June 22, 1987, but was continued at the request of ZENITH and the court next set trial for the weeks of March 21 and March 28, 1988. The trial date was again continued at the request of ZENITH. Prior to these scheduled trial dates, very little trial preparation occurred. Parties had set aside the entire week of March 7, 1988, for depositions of all critical experts in

174

the case. During those depositions, ZENITH indicated it was taking a common law petition for certiorari to the Second District Court of Appeal and no further trial preparation took place. Mr. Wetherington did not engage in the specific preparation of witness for trial or mark any exhibits prior to the March trial dates. Trial was rescheduled for the weeks of October 24 and 31 and November 7, 1988.

On September 12, 1988, Mr. Wetherington severed his employment with the Gibbons, Tucker firm and associated with the spin-off firm of Gibbons, Smith, Cohn and Arnett, P.A. Gibbons, Tucker instructed Mr. Wetherington not to contact any of its clients, including the plaintiffs.

Gibbons, Tucker then retained Mr. Hobbs to review the file for possible employment on the case. He later consented to handle the case and agreed with Gibbons, Tucker that he would receive fifty percent of the contracted fee between Gibbons, Tucker and the client for his services in completing the lawsuit.

At this point, no offer of settlement had been made by any defendant.

After consulting the Days on behalf of Gibbons, Smith, with whom he was now associated, and explained his resignation from Gibbons, Tucker and his availability to continue with the case should the Days desire to retain him, whereupon the Days contacted Gibbons, Tucker and instructed the firm to make the same arrangements with Mr. Wetherington that it was willing to make with Mr. Hobbs. Gibbons, Tucker refused, although their refusal was not communicated to the Days.

The Days considered that their interest would best be served by Mr. Wetherington's continuation on the case and on September 19, 1988, terminated their contract with Gibbons, Tucker and employed Mr. Wetherington of the more recently organized Gibbons, Smith association.

According to time records of Gibbons, Tucker, which were stipulated into evidence, Mr. Wetherington and his associates in the firm expended 2,163.70 hours on the case between October 24, 1984, and September, 1988, when his severance from the firm occurred. The accuracy of the hours spent has not been challenged, but their reasonableness has. Rates assessed to those hours vary, among the attorneys performing the work, but the records reflect an overall average hourly rate of 485.00, as the firm's fair appraisal of their value.

The billing draft of Gibbons, Tucker, indicated that over 150 hours

175

were spent by Mr. Wetherington and other firm attorneys in the drafting, revising and amending of the complaint in the case. This is a versatile and competent firm, but, at the time, its roster, contained no attorney with substantial experience in wrongful death and product liability cases or complex trial litigation of the kind in hand. This explains the seeking of Mr. Hobbs' services, and probably accounts for the fact that many hours of work appeared to have been misguided and duplicative, even more seemed to be unnecessary or wasted, in view of the sunken or abandoned theories of liability which had originally surfaced, and some hours, as hereinafter set forth, were required by Gibbons, Smith to spend on the case because of Gibbons, Tucker's reluctance to release the file in the matter. More than 15 hours were spent on Mr. Wetherington's departure and 10 hours were consumed to amend the contract of employment.

Crucial motions were scheduled to be heard on September 23, 1988. Mr. Wetherington requested Gibbons, Tucker to make available to him the case files so that he could prepare for that hearing as well as the trial which was set for October. Gibbons, Tucker demurred and Mr. Wetherington was required to file a motion for and obtain an emergency order compelling delivery of the files to him for properly prosecuting the litigation.

Mr. Wetherington obtained the services of David L. Partlow, Esquire, an associated at Gibbons, Smith, to assist him in concluding the case against Zenith. Mr. Partlow had been an electrical engineer by education and experience for many years prior to attending law school. After being admitted to the Bar in 1977, Mr. Partlow had worked as an arson prosecutor with the Tenth Circuit State Attorneys Office and had conducted 50 to 100 jury trials.

Mr. Wetherington and Mr. Partlow turned their attention to another component in the television set in the case against Zenith. They obtained discovery from Zenith which enabled them to reassert a claim for punitive damages based upon the presence in the television of a defective "tripler." As a result of the newly asserted claim for punitive damages, Zenith again moved for a continuance which the Court opined it was constrained to grant. Trial was rescheduled to begin January 23, 1989.

Zenith now asserted an additional defense that even if the tripler were capable of igniting a fire, that could occur only in a plastic portable model rather than in the Days' wooden console model. To meet this defense, Mr. Wetherington and Mr. Partlow assiduously pursued additional discovery. Through previous contact with the

**176**

independent fire cause and origin expert, they met Albert Fahlman, a television service technician and former Zenith dealer. Mr. Fahlman contributed significantly to the outcome of the case, both through his knowledge of the tripler problem and his obtaining comparable defective triplers and a television set, virtually the same as the Day's, which presented evidence of tripler failure and cabinet charring.

Settlement discussions began for the first time. In October, 1988, the converter defendant made their initial offer, and quickly came to terms with the Days. The Days received $35,000 in cash and a $25,000 claim against a defunct insurance carrier from the converter defendants.

In October, 1988, Zenith also made an offer of $300,000, which included the claim of State Farm Fire and Casualty Company for payment, and interest, under its homeowner's policy, which totalled approximately $220,000. Later, Zenith offered to pay the Days the entire $300,000.

In November, 1988, Zenith's excess insurance carrier first participated in the *Day v Zenith* dispute. Zenith then offered a structured settlement with a present value of approximately 4d385,000. The Days rejected this offer, and in December, 1988, Zenith made an Offer of Judgment to the Days of $520,000. No further settlement negotiations occurred until January 21, 1989, when the Court conducted a hearing, on Zenith's Motion for Summary Judgment regarding punitive damages, at a settlement conference. At that time, Zenith first saw the console television set that Mr. Fahlman had located.

The settlement conference concluded with Zenith offering $850,000, which included the $220,000 of State Farm. The Plaintiff rejected this offer and the case proceeded to trial on January 23, 1989. Following four days of vigorous and intensely adversarial trial, Zenith settled, paying $1,000,000 to the Days and $185,000 to State Farm Fire and Casualty Company on its subrogated claim. At all times and in all facets of the trial, the attorneys for the Plaintiff were professional aggressive, and effective, as protagonists, against equally effective and combatant defense counsel.

Detailed time records of Gibbons, Smith, reflect that 1178 billable hours were devoted to the case between September 13, 1988, and January 11, 1989. Incomplete expense records show over $73,000 in costs incurred.

Notice of attorneys' lien for services and costs was filed on October 18, 1988, by Gibbons, Tucker and, on January 16, 1989, the Court entered an Order enforcing its lien for costs in the amount of $20,238.57, reserving the firm's right to seek enforcement of its lien for

fees from any recovery in the case and also allowing State Farm's set off for costs previously paid.

A novel aspect of the case is presented in the fact that Mr. Wetherington was the lead working and controlling attorney for both of the disputing law firms in the case, and an additional complicating factor concerns the filing by the Gibbons, Smith firm of an action against the clients, Cynthia and Angela Day, as co-personal representatives of the estates, for reformation of the retainage contract entered with them when the Gibbons, Smith firm was employed, this case having been, perhaps ill-advisedly, consolidated for trial with the principal cause presented by the petition.

In the reformation suit, Gibbons, Smith, has asserted that the written contract between the personal representatives and the firm erroneously (and by mutual mistake) called for a contingent fee of only twenty-five percent of the amount recovered, whereas the contract was intended to comport with that of Gibbons, Tucker, which had provided for thirty-three percent if the case were submitted to trial.

Expert testimony by attorneys at the trial offered a wide range of opinions as to what a reasonable fee should be for the services of the Gibbons, Tucker firm; i.e. from fifty percent of the total fee awarded by the court to more than the thirty-three percent cap on the original contingency fee contract. An attorney of wide and extended experience in all aspects of complicated civil litigation, including product liability and wrongful death, testified that a fee of approximately 50% of the total amount allowable under the employment contract would be reasonable for the discharged attorneys.

CONCLUSIONS

Based upon the foregoing, together with research of controlling authority, the Court arrives at the following pertinent conclusions:

The law of Florida applies a variation of the quantum meruit theory, which allows the faultless discharged attorney to be compensated for the reasonable value of his services to the time of his discharge, limited by the original attorney client contract amount.

The law, as enunciated in the *Rosenburg* case (409 So.2d 1016) permits and direct that a trial court, in computing the amount of fees, consider the totality of the circumstances surrounding the attorney's employment. The attorney-client contract itself, the performance records and documented time spent by the attorney performing the services, the recovery sought, the results obtained, the impact of his services on the ultimate outcome of the case, and the skill required, are

178

relevant and necessary considerations for arriving at a reasonable and fair value.

The germane Florida decisions attempt to maintain meaningful balance between the right of the client to discharge his attorney, at any time for any reason, and to secure different representation, and the interest of the released attorney in receiving reasonable compensation for the services he has performed in good faith up to the time of his discharge without cause.

While irreconcilable differences exist among our courts of appeal, the prevailing law, as conceived by the Second District, requires that the trial court in this case must follow the guidelines established for the lodestar formula in the *Rowe* case (472 So.2d 1145), mandating that the criteria cataloged in Rule 4-1.5 of the *Florida Rules of Professional Conduct* must be considered as well as the records of time and work performed by the discharged attorney in attempted fulfillment of his obligation to his client.

In order to maintain credibility in the case under the direction of the present law, this Court must consider the relative value of time actually spent by the discharged attorneys in order to properly equate it with the number of hours reasonably required to accomplish their fair contribution to the overall success of the litigation upon which the contingent contract was based. In doing so, all surplusage, misguided and unnecessary effort, duplication, and the time and expense erroneously or thoughtlessly visited upon the succeeding attorney, must be subtracted from the actual time as reflected on the records of the discharged attorney.

This purging is required because the court, to realistically, rationally and fairly determine the petitioner's fee must balance, or equilibrate, the hours and rates charged by them against the overall value of litigating the case to the successful recovery. Put another way, there must be a reconciliation of the hours actually spent by petitioner with those reasonably required for the second firm's contribution to the total hours necessary for the recovery from which fees are to be paid. Without the successful conclusion, of course, no funds whatever would be available for attorneys' fees.

To apply the formula of *Rowe,* without this equitable adjustment, would mock the meaning of quantum meruit, i.e. "as much as he deserves."

While *Rowe* also provides that the trial court must consider a contingency risk factor only when awarding a statutorily directed reasonable attorney's fee, the court, has nevertheless, applied what it

**179**

thinks is a proper factor here in the belief that it has discretion to do so.

Moreover, in determining a proper amount of the fee for Gibbons, Tucker, on its lien, the Court is not only obliged to review and evaluate the number of hours listed by Gibbons, Tucker in the light of the law and evidence, but also, within the range and reflection of the court's own legal and judicial experience and common judgment. Indeed, this may be the primary justification for the Court's role in a disputed evaluation of this kind.

Assuming its function in this regard to properly evaluate the services upon an equitable basis, the Court, in the process, has reduced substantially the number of hours actually expended by the Gibbons, Tucker firm, the discharged attorneys, to those reasonably required in the firm's contribution to the overall recovery in the case but has, likewise, correlatively increased to some effect, the rating value of the hours expended in its struggle for a sound quantum meruit award.

In its sedulous attempt to arrive at a fair and equitable fee under the contingency contract the Court has attempted to keep in mind the following contributions to the reality and balance of its decision: (1) the holding of the Florida Supreme Court, 409 So.2d 1016, (1982), that in contingency fee cases, the cause of action for quantum meruit arises only upon a successful occurrence of the contingency and if that fails the discharged attorney likewise fails and receives nothing; (2) while there is no reason to speculatively assume or conclude that the favorable results achieved by Gibbons, Smith, were any better than those which would have been achieved by Gibbons, Tucker, (and they may have been even better if the services of Mr. Hobbs had been brought to bear upon the case), the record, in the court's opinion, does clearly disclose that the intensity, and hourly value, of the services of Mr. Wetherington, with his associate, had markedly increased during the several months immediately preceding and during the jury trial, up to and including the completion of settlement; and (3) the strong public policy of Florida, that the client is entitled, at the time of employment, to a practical expectation of reasonable sure-footed professionalism and competence, on the part of both the initial and succeeding attorneys, to adeptly and efficiently perform the unique services covered by their employment contracts.

While the client, in the exercise of his unfettered right to discharge and employ the attorneys, might, himself, be the author of considerable extra expense, for which the attorneys are not responsible; nevertheless, he should not be saddled with the costs of furnishing experience and

training time for his lawyers to become skillful enough, in the specialty involved, to expertly and properly perform their jobs, or to incur charges for unnecessarily time-consuming, duplicative, adventurous or excursive pursuits, however well-intentioned, by counsel in his cause.

Based upon all of the foregoing, and being fully advised, the Court, upon consideration, orders and adjudges as follows:

1. The Petitioner was discharged by the Plaintiffs without cause prior to the completion of this case and is accordingly entitled to be paid a reasonable fee for its services;

2. The Petitioner reasonably expended 1250 hours in the prosecution of this case as counsel for the Plaintiffs prior to discharge;

3. The rate of $90.00 per hour is a reasonable hourly rate to be awarded the Petitioner for its services;

4. Petitioner was employed on a contingency fee basis and the appropriate risk multiplier to be applied in this case is *1.5;*

5. A reasonable fee to be awarded the Petitioner for its services is $168,750 and Petitioner is awarded a lien for its attorney's fee in said amount plus a prorata share of any interest accrued on the proceeds of settlement during the pendency of this action and until Petitioner's attorney fee lien shall be satisfied;

6. This Court shall retain jurisdiction to enter any and all orders necessary or appropriate to enforce Petitioner's attorney fee lien and to grant such other and further relief as may be appropriate.

DONE AND ORDERED in Chambers at St. Petersburg, Pinellas County, Florida, this 15th day of September, 1989.